The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
March 20, 2025

**2025COA31**

**No. 23CA1537, *Ross v. Public Service* — Damages — Wrongful
Death — Limitation on Damages — Felonious Killing Exception
— Corporations**

As a matter of first impression, the division holds that the

"felonious killing exception" to the noneconomic damages cap in the

Wrongful Death Act (WDA), § 13-21-203(1)(a), C.R.S. 2024, applies

to corporations and individuals; so corporations that commit

felonious killings are subject to uncapped noneconomic damages in

wrongful death claims. In so concluding, and with the goal of

avoiding an absurd result, the division looked to the definition of a

felonious killing in section 15-11-803(1)(b), C.R.S. 2024, as applied

in the context of the WDA and consulting the WDA's legislative

history. The division also holds that the district court properly

interpreted 49 C.F.R. § 192.614 (2024) and properly included

nonparties on the verdict form but that the court erred by

apportioning the plaintiff's damages according to the jury's fault

allocations before applying the damages cap.

COLORADO COURT OF APPEALS 2025COA31

Court of Appeals No. 23CA1537
City and County of Denver District Court No. 20CV33286
Honorable Stephanie L. Scoville, Judge

Estate of Carol Ross, by and through its personal representatives Derek Ross and Tanya Weindler,

and

Derek Ross and Tanya Weindler as heirs to Carol Ross,

Plaintiffs-Appellants and Cross-Appellees,

v.

Public Service Company of Colorado, d/b/a Xcel Energy,

Defendant-Appellee and Cross-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Lum and Hawthorne*, JJ., concur

Announced March 20, 2025

Burg Simpson Eldredge Hersh & Jardine, P.C., Michael S. Burg, Holly B. Kammerer, Dean Batchelder, Jessica B. Prochaska, Shane C. Fulton, Englewood, Colorado, for Plaintiffs-Appellants and Cross-Appellees

Davis Graham & Stubbs LLP, Theresa Wardon Benz, Tess Hand-Bender, Jackie Roeder, Aditi Kulkarni-Knight, Claire Mueller, Denver, Colorado, for Defendant-Appellee and Cross-Appellant

Leventhal Puga Braley P.C., Nathaniel E. Deakins, Denver, Colorado, for Amici Curiae Colorado Trial Lawyers Association and the Rocky Mountain NAACP Colorado-Montana-Wyoming State Conference

Lewis Roca Rothgerber Christie LLP, Kendra N. Beckwith, Denver, Colorado, for Amici Curiae Colorado Defense Lawyers Association and Colorado Civil Justice League

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Plaintiffs, the estate of Carol Ross by and through its personal representatives and Carol Ross's heirs, Derek Ross and Tanya Weindler (collectively, Ross), appeal the district court's judgment against defendant, Public Service Company of Colorado, d/b/a Xcel Energy (PSCo), a Colorado corporation.[1]  We affirm in part, reverse in part, and remand with directions.

## I.    Background

¶ 2     In 2017, Heather Gardens Association (Heather Gardens), a nonprofit corporation and retirement community made up of several townhomes in Aurora, contracted with Comcast to install underground fiber optic cables for internet and television services. Comcast contracted with Integrated Communication Services Inc. (ICS) to manage excavation and drilling work for the project.  ICS then contracted with Bohrenworks, LLC (Bohrenworks), to perform excavation and drilling activities, and Bohrenworks, in turn, subcontracted with Underground Communications, LLC (Underground) (collectively, the excavators).

---

[1] Two amici have also filed helpful briefs concerning the felonious killing exception and the wrongful death damages cap, one in support of Ross's interpretation and the other in favor of PSCo's interpretation.

¶ 3     PSCo operated natural gas pipelines underneath Heather Gardens and documented that the excavators damaged the gas lines six times between August and November 2018 as the project progressed.  During the sixth incident, on November 16, 2018, excavators were conducting horizontal drilling near Ross's home without first obtaining "locates" (markers for underground pipelines) when their drill ruptured one of the gas lines.  The pipeline rupture allowed large quantities of natural gas to fill Carol Ross's home.  The drill operator called 911 at 4:04 p.m., and the gas ignited approximately an hour and a half later, causing a large explosion that killed Carol Ross and destroyed her home.  PSCo successfully shut off the main natural gas pipelines leading to the area around 7:00 p.m., and firefighters were then able to extinguish the remaining fire.

¶ 4     Ross's estate and heirs sued the excavators, Comcast, Heather Gardens, and PSCo.[2]  The excavators, Comcast, and Heather Gardens settled the claims against them, leaving only Ross's claims against PSCo for trial.  Ross asserted claims for wrongful death,

_____

[2] Other Heather Gardens residents were plaintiffs in the lawsuit and trial, but they are not parties to this appeal.

negligence, negligence per se, strict liability, and extreme and outrageous conduct against PSCo.

¶ 5   The district court made four rulings — before and during trial — that are at issue in this appeal and cross-appeal. All challenges to these rulings were preserved for appeal. *See Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 25.

## II.   The Felonious Killing Exception

### A.   Additional Background

¶ 6   Before trial, Ross petitioned the district court for a determination of a question of law, *see* C.R.C.P. 56(h), that the "felonious killing exception" (the exception) to the noneconomic damages cap in section 13-21-203(1)(a), C.R.S. 2024 (version effective until Jan. 1, 2025),[3] of the Wrongful Death Act (WDA) applied to Ross's wrongful death claim.

---

[3] The Colorado Legislature amended section 13-21-203(1)(a), C.R.S 2024, with House Bill 24-1472, effective January 1, 2025. Ch. 325, sec. 2, § 13-21-203, 2024 Colo. Sess. Laws 2171-74, 2178. Now, under section 13-21-203(1)(a), the noneconomic damages cap has been raised to $2,125,000, with adjustments for inflation pursuant to section 13-21-203.7(1.5), C.R.S. 2024. This opinion cites the version of section 13-21-203(1)(a) that was in effect until January 1, 2025.

¶ 7     Section 13-21-203(1)(a) provides, in pertinent part, that in

wrongful death actions,

> [n]otwithstanding anything in this section or in
> section 13-21-102.5[, C.R.S. 2024,] to the
> contrary, there shall be no recovery . . . for
> noneconomic loss or injury in excess of two
> hundred fifty thousand dollars, unless the
> wrongful act, neglect, or default causing death
> constitutes a felonious killing, as defined in
> section 15-11-803(1)(b), C.R.S. [2024], and as
> determined in the manner described in section
> 15-11-803(7), C.R.S.

After adjustments for inflation, the cap for claims like Ross's that

accrued between January 2008 and 2020 was $436,070.  *See* § 13-

21-203.7(1), C.R.S. 2024.

¶ 8     Section 15-11-803(1)(b), in turn, defines a felonious killing as

"the killing of the decedent by an individual who, as a result

thereof, is convicted of, pleads guilty to, or enters a plea of nolo

contendere to the crime of murder in the first or second degree or

manslaughter."  In civil proceedings a criminal conviction is not

required because "a court of competent jurisdiction, upon the

petition of an interested person, shall determine whether, by a

preponderance of evidence standard, each of the elements of

4

felonious killing of the decedent has been established." § 15-11-803(7)(b).

¶ 9 After briefing and oral arguments on the matter, the district court concluded the "plain language of the statute does not provide that an entity may be liable for a felonious killing."

## B. Analysis

¶ 10 On appeal, Ross argues the district court erred by concluding that the felonious killing exception to the WDA's damages cap does not apply to corporations.

¶ 11 Ross argues the WDA's plain language and the felonious killing exception's context within the WDA evidences the legislature's intent to apply the exception to corporations. Ross also argues that, even if the felonious killing exception is ambiguous, the statute's legislative history and the purpose of the exception favor the exception's application to corporations.

¶ 12 PSCo counters that (1) the district court's interpretation is correct and the exception cannot apply to corporations; and (2) regardless, any error was harmless because Ross did not present evidence that PSCo committed a felonious killing.

1. Standards of Review and Principles of Statutory Construction

¶ 13    We interpret statutory language de novo.  *Simpson v. Cedar Springs Hosp., Inc.*, 2014 CO 73, ¶ 15.

¶ 14    "In determining the meaning of a statute, our central task is to ascertain and give effect to the intent of the General Assembly." *Jefferson Cnty. Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935 (Colo. 2010).

> [W]e strive to give effect to the legislative purposes by adopting an interpretation that best effectuates those purposes.  In order to ascertain the legislative intent, we look first to the plain language of the statute, giving the language its commonly accepted and understood meaning.  Where the statutory language is clear and unambiguous, we do not resort to legislative history or further rules of statutory construction.

*Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo. 2010) (citations omitted).

¶ 15    We must read "[t]he language at issue . . . in the context of the statute as a whole and the context of the entire statutory scheme. Thus, our interpretation should give consistent, harmonious, and sensible effect to all parts of a statute." *Gerganoff*, 241 P.3d at 935 (citations omitted).  When examining the language in a statute, we

must also "constru[e] words and phrases according to grammar and common usage." *Id.*

¶ 16    However, "[a] statute is ambiguous when it 'is capable of being understood by reasonably well-informed persons in two or more different senses.'" *Id.* (quoting 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 45:2, at 13, 19 (7th ed. 2007)). And "where a statute is ambiguous, we employ additional interpretational aids to assist with 'selecting among reasonable interpretations of the particular language chosen by the legislature.'" *Id.* (quoting *Union Pac. R.R. Co. v. Martin*, 209 P.3d 185, 188 (Colo. 2009)). For example, "we may look for guidance to statutory history, expressions of purpose . . . in legislative declarations, and the consequences of a particular construction." *Id.* But "[w]e avoid interpretations that would lead to an absurd result." *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1089 (Colo. 2011); *see also Smith*, 230 P.3d at 1191 ("The rule that we will deviate from the plain language of a statute to avoid an absurd result must be reserved for those instances where a literal interpretation of a statute would produce a result contrary to the expressed intent of the legislature.").

### 2.    Application

#### a.    Statutory Language

¶ 17    To determine whether the felonious killing exception to the WDA's damages cap applies to corporations, we begin by looking to the language of the statutes at issue, here section 13-21-203(1)(a) of the WDA and section 15-11-803(1)(b) of the probate code, in the respective contexts of each statute and the statutory schemes as a whole.  *See Gerganoff*, 241 P.3d at 935.

¶ 18    Section 13-21-203(1)(a) provides, in pertinent part, that for every wrongful death action,

> the jury may give such damages as they may deem fair and just, with reference to the necessary injury resulting from such death, including damages for noneconomic loss or injury . . . and subject to the limitations of this section . . . .  [But] there shall be no recovery under this part 2 for noneconomic loss or injury in excess of two hundred fifty thousand dollars, unless the wrongful act, neglect, or default causing death constitutes a felonious killing, as defined in section 15-11-803(1)(b), C.R.S., and as determined in the manner described in section 15-11-803(7), C.R.S.

Section 15-11-803(1)(b) defines a felonious killing as

> the killing of the decedent by an individual who, as a result thereof, is convicted of, pleads guilty to, or enters a plea of nolo contendere to

> the crime of murder in the first or second degree or manslaughter, as said crimes are defined in sections 18-3-102 to 18-3-104, C.R.S. [2024].

¶ 19    At issue is what "the killing of the decedent by an *individual*" in section 15-11-803(1)(b) (emphasis added) means in the context of the WDA and its damages cap.

¶ 20    The district court determined that the use of the word "individual" in section 15-11-803(1)(b) means that the exception does not apply to corporations.  It noted that the probate code defines "[p]erson" as "an individual or an organization," § 15-10-201(38), C.R.S. 2024, and that the Colorado Revised Statutes' general definitions, which "apply to every statute, unless the context otherwise requires," define "[p]erson" as "any individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, limited liability company, partnership, association, or other legal entity."  § 2-4-401(8), C.R.S. 2024.

¶ 21    The court also pointed to other statutes illustrating that "person" is used to refer to individuals and organizations, while "individual" is used to refer to human beings.  *See, e.g.*, § 12-10-702(10), C.R.S. 2024 (In statutes governing professions and

9

occupations, "'[i]ndividual' means a natural person."); § 7-90-102(31.5), (49), C.R.S. 2024 (In statutes governing corporations and associations, "'[i]ndividual' means a natural person," but "'[p]erson' means an individual, an estate, a trust, an entity, or a state or other jurisdiction."); § 5-19-202(11), (12), C.R.S. 2024 ("'Individual' means a natural person," but "'[p]erson' means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, or any other legal or commercial entity."); *see also People v. Rodriguez-Morelos*, 2025 CO 2, ¶¶ 8-19 (Colorado's identity theft statute, § 18-5-902(1)(a), C.R.S. 2024, prohibiting, in part, the unlawful knowing "uses [of] personal identifying information," cannot support a conviction for the unlawful use of an organization's name and distribution of tax exemption documents because the definition of "[p]ersonal identifying information," § 18-5-901(13), C.R.S. 2024, refers to information used "to identify a specific individual," and most of the examples of information in the definition could only refer to human

beings.).[4]  Thus, even though business entities like corporations may be found guilty of criminal offenses just like natural persons, *see* § 18-1-606(1), (2)(b), C.R.S. 2024, the district court narrowly read "individual" not to include corporations.

¶ 22    But we are not tasked with examining the meaning of a felonious killing solely in the context of 15-11-803 or other probate code provisions.  Rather, we need to consider the definition in the operative context of the WDA to decide whether the meaning of a felonious killing — as used in the WDA — is more expansive. Indeed, section 15-11-803(1) begins by recognizing that its definitions apply "unless the context otherwise requires."

¶ 23    Importantly, the WDA explicitly provides that "[w]hen the death of a person is caused by a wrongful act, neglect, or default of another, . . . the *person who or the corporation which* would have been liable, if death had not ensued, shall be liable in an action for damages notwithstanding the death of the party injured."  § 13-21-

---

[4] The district court also cited *Lunsford v. Western States Life Insurance*, 908 P.2d 79, 84 (Colo. 1995), which states, in regards to section 15-11-803(3) (governing the revocation of benefits made by a decedent's governing instruments like a will to a beneficiary who committed a felonious killing), that it "must be strictly construed, and exceptions to the literal language cannot be superimposed."

202, C.R.S. 2024 (emphasis added).  So while the definition of a felonious killing from 15-11-803(1)(b) does not expressly reference corporations, the WDA explicitly intends to hold individuals *and* corporations equally liable for wrongful deaths.  The legislature could have explicitly stated that corporations would never be faced with damages exceeding the cap but did not do so in section 13-21-203(1)(a).  Moreover, the legislature used "person" in the WDA in a manner synonymous with how "individual" is used in other statutes, so we should be hesitant to rely exclusively on the use of "individual" or "person" to determine the legislature's intent in the context of the WDA.

¶ 24     Ultimately, we have two plausible interpretations based on the language of the two statutes.  First, the legislature could have intended that corporations and individuals may be held liable for wrongful deaths, allowing both to take advantage of the protections offered by the WDA's damages cap — but intended for corporations to be protected by the damages cap without exception.  Emphasizing the literal language in isolation — ignoring context — this interpretation relies solely on the word "individual" in the

felonious killing definition, § 15-11-803(1)(b), to find that the exception would never apply to corporations.

¶ 25     But, in context, a second interpretation is that the legislature intended corporations and individuals to be held liable for wrongful deaths, with the same protections offered by the cap, subject also to the felonious killing exception.  In this interpretation, the word "individual" in the felonious killing definition — when applied in a WDA context — becomes synonymous with "person" as used in other statutes.  This contextual view examines the WDA "as a whole and [in] the context of the entire statutory scheme," seeking a "consistent, harmonious, and sensible" interpretation of a felonious killing when the WDA is invoked.  *Gerganoff*, 241 P.3d at 935.

¶ 26     Because there are two ways to understand section 13-21-203(1)(a) — referencing section 15-11-803(1)(b)'s felonious killing definition — we conclude the statute is ambiguous.  So, we turn to other aids of statutory interpretation to discern the legislature's intent.  *See Gerganoff*, 241 P.3d at 935.

b.     Legislative History

¶ 27     The modern version of the WDA's damages cap was added to section 13-21-203(1)(a) in 1989.  Ch. 130, sec. 2, § 13-21-203(1)(a),

1989 Colo. Sess. Laws 752-53.  The felonious killing exception was added in 1996 via House Bill 1001 (H.B. 1001).  Ch. 17, sec. 1, § 13-21-203(1), 1996 Colo. Sess. Laws 49-50.  The most pertinent legislative history on the question before us comes from legislative committee hearings in 1996, ahead of the bill's passage.

¶ 28     Representative Foster, one of H.B. 1001's sponsors, and Representative Lamborn discussed the proposed exception's application to corporations.  *See* Hearings on H.B. 1001 before the H. Judiciary Comm., 60th Gen. Assemb., 2d Reg. Sess. (Jan. 19, 1996) (hereinafter, Jan. 19 Hearing).

¶ 29     Representative Lamborn asked whether the bill's sponsors envisioned that the bill would apply to product liability cases, such as defective products where a corporation causes deaths (rather than individual murderers), and how the bill would affect businesses.  *Id.*  Representative Foster responded,

> Let me tell you, if the business community is committing manslaughter or first or second degree, then it should. . . .  You tell me why it is that you or I as individuals should be held to one standard and somehow corporate America to another . . . .
>
> And I'm pretty pro-business, Representative Lamborn.  I'm hard pressed to figure out why

> it is that Ford should be able to commit a manslaughter.

*Id.*

¶ 30    Later, the legislature discussed the impetus for adding the felonious killing exception. *See* Hearings on H.B. 1001 before the S. Judiciary Comm., 60th Gen. Assemb., 2d Reg. Sess. (Feb. 19, 1996) (hereinafter, Feb. 19 Hearing). Senator Matsunaka, another sponsor, shared that a purpose for passing the felonious killing exception was to allow WDA plaintiffs to pursue the assets of those who commit felonious killings. *Id.* An opinion issued by a division of this court the year before — *Aiken v. Peters*, 899 P.2d 382, 384-85 (Colo. App. 1995) (ruling that the WDA damages cap applied to a WDA claim brought against a father by adult surviving children after their father shot and killed their mother) — was referenced as an impetus for the bill. *See* Feb. 19 Hearing.

¶ 31    This legislative history indicates that the legislature, or at least some of the bill's sponsors, contemplated that the felonious killing exception would apply to corporations. *See* Jan. 19 Hearing. Even if it also seems that legislators were principally concerned with individuals who committed felonious killings, rather than

corporations, no legislator in the hearings explicitly said that corporations were not intended to be covered by the felonious killing exception. *See* Feb. 19 Hearing. Indeed, at least one bill sponsor explicitly believed corporations would be covered. *See* Jan. 19 Hearing. Further, the hearings indicate that the felonious killing exception's intent was to protect WDA plaintiffs by allowing them to recover greater noneconomic damage awards. *See* Jan. 19 Hearing; *see also* Feb. 19 Hearing.

  c.  The Felonious Killing Exception Applies to Corporations

¶ 32  We conclude that the district court's interpretation of the word "individual" in section 15-11-803(1)(b) was erroneous.

¶ 33  The WDA context persuades us that an overly formalistic view of the definition of a felonious killing in section 15-11-803(1)(b) is unwarranted. Recall that section 15-11-803(1) expressly contemplates that its definitions be considered in their relevant context. In the context of the WDA, we conclude that the legislature's intent was to allow the damages cap to be lifted when both individuals and corporations commit felonious killings.

¶ 34  The WDA's language explicitly allows wrongful death actions against corporations, without mentioning that corporations would

16

be entitled to greater protections than individuals. *See* §§ 13-21-202, 203(1)(a). The legislative history of the felonious killing exception and the exception's underlying purpose also support the exception's application to both individuals and corporations. *See* Jan. 19 Hearing; *see also* Feb. 19 Hearing. And it makes no sense to uncap damages for a felonious killing by an individual, but leave damages capped for the same killing by a corporation. Such an interpretation — based solely on the literal language of the felonious killing exception while ignoring the context of the WDA and the relevant legislative history — would be contrary to the legislature's intent to require individuals and corporations to compensate WDA plaintiffs. *See Ritter*, 255 P.3d at 1089; *Smith*, 230 P.3d at 1191; *see also* § 15-11-803(1) (recognizing that context matters).

¶ 35     For these reasons, we conclude the district court erred.

¶ 36     PSCo argues that any error would have been harmless because there was no evidence that it committed a felonious killing. But the district court expressly refused to make such a determination given its narrow interpretation of the statutes. We therefore remand the case for the district court to "determine whether, by a preponderance of evidence," Ross established each

element of a felonious killing.  § 15-11-803(7)(b).  If the district court determines the requisite elements have been established, it must remove the cap and increase Ross's damages accordingly.

### III.  Applicability of 49 C.F.R. § 192.614(c)(6)

### A.  Additional Background

¶ 37  Before trial, PSCo moved for a determination of law pursuant to C.R.C.P. 56(h) concerning a federal regulation, 49 C.F.R. § 192.614 (2024) (the Inspection Regulation or the regulation), arguing that the regulation did not require it to supervise the excavators at Heather Gardens.

¶ 38  The regulation, titled "[d]amage prevention program," details that "each operator of a buried pipeline must carry out, in accordance with this section, a written program to prevent damage to that pipeline from excavation activities."  49 C.F.R. § 192.614(a).  Under 49 C.F.R. § 192.614(c)(6)(i), the written programs required by 49 C.F.R. § 192.614(a)

> must, at a minimum:
>
> . . . .
>
> . . . [p]rovide . . . for inspection of pipelines
> that an operator has reason to believe could be
> damaged by excavation activities:

> (i) The inspection must be done as frequently as necessary during and after the activities to verify the integrity of the pipeline . . . .

¶ 39     After the parties briefed the issue, the district court issued its Rule 56(h) order.  The district court found that the Inspection Regulation "required inspection of pipelines in the vicinity of excavation activities such as the pipelines at Heather Gardens because the undisputed facts establish that PSCo had reason to believe that lines in Heather Gardens could be damaged" and "plainly required an inspection from PSCo when it received a report that a line was struck by [the] Excavators."  But it also found that "the plain language of the Inspection Regulation does not . . . establish any obligation to inspect excavation activities to prevent a strike from occurring."  Thus, the court concluded that while the Inspection Regulation required PSCo "to inspect the pipeline to ensure that it was not damaged by [the] Excavators," it did not require PSCo to contemporaneously supervise "the activities of [the] Excavators."

¶ 40     Ross later orally moved for reconsideration of the Rule 56(h) order in a pretrial hearing.  The court declined to reconsider its ruling, but sought to clarify its order by stating,

> I have not said that [the Inspection] [R]egulation has no application to these facts. It does have application to these facts. It does apply when an excavator is hitting a gas line. It does require inspection in circumstances like this where the gas company has notice that there are excavation activities that are happening that . . . would or could damage the line. It absolutely has some application in this case. I have not said that it has no application and I have not said that I will exclude all evidence of it.
>
> But what I have found is that this regulation applies to the pipeline. It does not apply to inspection of excavation activities. Those are two different things. And so the plain language on its face requires the gas company to inspect to verify the integrity of the pipeline, and that is the scope of my ruling. . . .
>
> And so I have not said that there can be no discussion of this regulation.

With that clarification, Ross's counsel agreed "there is no need for any reconsideration" given the scope of the court's order.

¶ 41 The court's Rule 56(h) order resurfaced when Ross sought to introduce related testimony from expert Michael Hanzlick. Hanzlick worked for PSCo in various supervisory roles related to natural gas, including as a "a supervisor of Gas Utilization and Testing" — which Hanzlick said included duties "to actually draft [company] standards and modify the standards to make sure they complied

20

with the Federal Regulations, and to make sure that our training requirements . . . complied with the Federal Regulations." The court certified Hanzlick as an expert in "Natural Gas [O]perations, which would include training, [d]amage [p]revention, and [e]mergency [r]esponse."

¶ 42    Ross's counsel asked Hanzlick if he was "familiar" with the Inspection Regulation, and Hanzlick confirmed that he was. Ross's counsel later asked, "Does [the Inspection] Regulation specify the type of inspections that need to [be] done?" But PSCo objected before Hanzlick answered, "No, not specifically." In a sidebar discussion outside the presence of the jury, Ross's counsel informed the court that they next planned "to ask him if you do Stand and Watch, do you have an opinion as to whether or not that would qualify as an inspection." The court looked to Hanzlick's supplemental expert report and summarized that Hanzlick's testimony would be that "observ[ing] . . . the contractor doing the actual work" qualified as an inspection.

¶ 43    The court found that it would "not permit the question that is currently posed, . . . because that opinion has either been non-

disclosed or it's an opinion that's in violation of my order."  It added

that, as it related to the planned "Stand and Watch" questioning,

> I really have tried to give Plaintiffs the absolute maximum latitude in talking about th[e] [Inspection] Regulation.
>
> First of all, I will remind you there are lots of ways to talk about Stand and Watch that are not just about the regulation.
>
> So, to the extent the questions are about the [Inspection] Regulation and whether the [Inspection] Regulation means Stand and Watch, I've said it does not. . . .
>
> Whether or not there [are] other permissible opinions that he may offer about Stand and Watch, I think that he can, because he discussed Stand and Watch in the supplemental report.

The court then sustained the objection.

¶ 44    Ross's counsel was then allowed to ask Hanzlick several

questions about "Stand and Watch," including, for example,

defining Stand and Watch inspections for the jury — "a person

physically standing and watching the excavator as they do the

excavation," according to PSCo's internal manual.  Hanzlick also

stated that "the purpose of the Stand and Watch Program is to

watch the excavator[s] as they're doing the excavation to prevent

22

damage" and that, given the prior hits to PSCo's gas lines, it was his opinion that "Stand and Watch would [have been] required."

¶ 45 Hanzlick mentioned the Inspection Regulation several times during PSCo's cross-examination, and the court struck the testimony, instructing the jury that "we are going to have some questions about Stand and Watch and that program without reference to the [Inspection] Regulation." Later, PSCo's counsel asked the court to issue an instruction that a Stand and Watch program and the Inspection Regulation "have nothing to do with [each] other, . . . to cure that prejudice so there's no confusion on this issue." The court then stated, "We've had three questions . . . which directly contravened the Court's prior rulings about the meaning of [the Inspection] Regulation . . . and the Court's ruling that that regulation does not require utilities, such as [PSCo], to inspect[] excavation activities." The court found that a curative instruction was unnecessary, however, given the prior jury instruction explaining why Hanzlick's testimony was stricken.

¶ 46 Finally, the court tendered two jury instructions concerning the Inspection Regulation. Ross proposed Instruction 17:

At the time of the occurrence in question in this case, federal regulations 49 [C.F.R. §] 192.614 and 49 [C.F.R. §] 192.615 were in effect.

If you find the defendant, [PSCo], violated these federal regulations you may consider this violation as evidence that the defendant failed to exercise reasonable care. You may consider this evidence with all other evidence in determining whether the defendant exercised reasonable care.

PSCo proposed Instruction 18:

[The Inspection] Regulation 49 C.F.R. § 192.614 sets out minimum requirements for operators of buried pipelines. The [Inspection] [R]egulation requires that an operator inspect pipelines that an operator has reason to believe could be damaged by excavation activities as frequently as necessary during and after activities to verify the integrity of the pipeline. The regulation does not establish an obligation to inspect excavation activities to prevent a strike from occurring.

¶ 47    The court reasoned that the jury heard extensive lay and expert testimony about the Inspection Regulation, and while the regulation did not "create a duty," it could serve "as conclusive evidence of the standard of care" and was relevant evidence that had "some bearing on the case." The court therefore determined that Instruction 17 was appropriate but added that "once we are

24

into the realm of Instruction . . . 17, then it is absolutely appropriate . . . to give . . . the companion instruction in 18, which is about the meaning of . . . the [Inspection Regulation]." It summarized the issue by stating, "[I]f the jury is being told how to use the regulation, then it is appropriate for them to be told what it means."

## B.   Analysis

¶ 48   Ross contends that the district court erred when it ruled, in its Rule 56(h) order, that the plain language of the Inspection Regulation "does not require that the operator inspect or regulate excavation activities near the pipeline." Ross argues that the court misinterpreted the Inspection Regulation because the regulation requires PSCo and pipeline operators to supervise excavation activities. Ross also argues that the error prejudiced Ross because the court relied on the ruling to prevent Hanzlick from testifying that the Inspection Regulation required "Stand and Watch" programs. Lastly, Ross argues that the reasoning underlying the Rule 56(h) order led the district court to improperly instruct the jury when the court tendered Instruction 18 based on that ruling.

¶ 49    PSCo argues that the district court's interpretation was correct and that the court properly limited Hanzlick's testimony and correctly instructed the jury.

### 1.    Standards of Review

¶ 50    "We review the district court's determination of questions of law under C.R.C.P. 56(h) . . . de novo." *State ex rel. Coffman v. Robert J. Hopp & Assocs., LLC*, 2018 COA 69M, ¶ 42.  We review the district court's interpretation of federal agency regulations de novo and apply the same principles as we would when interpreting a statute "in a manner that gives [the regulations] effect according to their plain meaning." *USA Tax Law Ctr., Inc. v. Off. Warehouse Wholesale, LLC*, 160 P.3d 428, 431 (Colo. App. 2007); *see also Time Warner Ent. Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1050 (10th Cir. 2004).

¶ 51    "We review de novo whether a particular jury instruction correctly states the law.  In that review, we examine whether the instructions as a whole accurately informed the jury of the governing law." *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011) (citation omitted).  But "[a]s long as the instruction properly informs the jury of the law, a trial court has broad discretion to determine

the form and style of jury instructions.  Therefore, we review a trial court's decision to give a particular jury instruction for an abuse of discretion."  *Id.* (citation omitted).

¶ 52     "We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion.  A trial court abuses its discretion only if its ruling is manifestly arbitrary, unreasonable, or unfair."  *Gonzales v. Windlan,* 2014 COA 176, ¶ 20 (citation omitted).

## 2.     Application

¶ 53     To determine if the district court correctly informed the jury of the law concerning the Inspection Regulation, we need to examine the plain language of the regulation.

¶ 54     The Inspection Regulation, concerning a "[d]amage *prevention* program," provides that "each operator of a buried pipeline must carry out, in accordance with this section, a written program to *prevent* damage to that pipeline from excavation activities."
§ 192.614(a) (emphases added).  It further provides that the written programs required by subsection (a) must, at a minimum, provide "for inspection of pipelines that an operator has reason to believe *could* be damaged by excavation activities . . . as frequently as

27

necessary *during* and after the activities to verify the integrity of the pipeline . . . ." § 192.614(c)(6)(i) (emphases added).

¶ 55    Ross points to the above italicized language as evidence "that operators may need to be present at their pipeline during excavation." The plain language of the Inspection Regulation does concern damage prevention, but it does not require that operators supervise excavators. The key language in the Inspection Regulation is that operators must conduct inspections "as frequently as necessary during and after" excavations to "verify the integrity of the pipeline." § 192.614(c)(6)(i). This is not to say that a Stand and Watch program would never be appropriate; but the Inspection Regulation does not explicitly require Stand and Watch procedures for every excavation — it requires that operators inspect pipelines to verify their integrity when necessary.

¶ 56    That the Inspection Regulation focuses on "prevention" does not undermine this conclusion, particularly when the regulation focuses on means to prevent pipeline damage through early notice systems. *See* § 192.614(c)(1) (requiring operators to include the identities of excavators who "normally engage in excavation activities in the area in which the pipeline is located");

28

§ 192.614(c)(2)(ii) (requiring notice to allow excavators "to learn the location of underground pipelines before excavation activities are begun"); § 192.614(c)(5) (requiring operators to "[p]rovide for temporary marking of buried pipelines in the area of excavation activity before, as far as practical, the activity begins"). Ross's interpretation of the Inspection Regulation would improperly expand its scope and add specific requirements the regulation lacks.

¶ 57    As a result, the district court did not misinform the jury about the regulation. And because we conclude that the district court did not misinterpret the Inspection Regulation, we find that its later decisions to prevent Hanzlick from testifying explicitly that the Inspection Regulation required Stand and Watch programs and to include Instruction 18 to be appropriate.

¶ 58    The district court properly allowed Hanzlick to testify about the Inspection Regulation more broadly and properly allowed the jury to consider the Inspection Regulation as evidence of a standard of care. *See Bennett v. Greeley Gas Co.*, 969 P.2d 754, 759 (Colo. App. 1998). But the district court had "broad discretion . . . to determine whether evidence should be excluded because it would

29

confuse the issues or mislead the jury." *Liscio v. Pinson*, 83 P.3d 1149, 1154 (Colo. App. 2003) (citation omitted); *see also Windlan*, ¶ 20. And "[a]s long as the instruction properly informs the jury of the law, a trial court has broad discretion to determine the form and style of jury instructions." *Johnson*, 255 P.3d at 1067. Instruction 18, included to explain the Inspection Regulation, was appropriate given the extensive discussion of the regulation and Instruction 17's direction to use it as evidence of the standard of care and did not misstate the law. We discern no error in these decisions.

## IV. Jury Instruction 26 and Nonparties on the Verdict Form

### A. Additional Background

¶ 59 PSCo proposed Instruction 26, which provided that PSCo's "affirmative defense of the negligence of nonparties" (Aurora Fire Rescue,[5] Comcast, the excavator companies, and Heather Gardens) would be proved if the jury found that (1) the nonparties were negligent, and (2) their negligence was a cause of Ross's injuries, losses, or damages.

---

[5] While Ross did not sue Aurora Fire Rescue, PSCo designated Aurora Fire Rescue as a nonparty at fault.

¶ 60     Ross argued that the instruction was erroneous because it allowed the jury to find multiple nonparty actors responsible "for the same conduct" — namely, "the actual line strike" — and that there should not be an allocation of fault for "derivative" conduct. Ross also argued that only some of the nonparties should have been included on the verdict form.

¶ 61     The court disagreed, however, and found that PSCo and the nonparties had not engaged in the same conduct. The special verdict form allowed the jury to decide whether PSCo and each nonparty was negligent and whether their negligence caused Ross damages, and it instructed the jury to allocate the percentage of fault between PSCo and the designated nonparties.

¶ 62     The jury found that PSCo was negligent and caused Ross damages but that each designated nonparty was also negligent and caused Ross damages. The jury declined to award Ross punitive damages against PSCo but awarded Ross's heirs $15 million in

noneconomic damages.[6] The jury allocated fault amongst PSCo and the designated nonparties as follows:

| Party/Designated Nonparty: | Percentage of Fault Allocated: |
| --- | --- |
| PSCo | 12% |
| Aurora Fire Rescue | 18% |
| Comcast | 14% |
| ICS | 14% |
| Bohrenworks | 26% |
| Underground | 9% |
| Heather Gardens | 7% |

B.    Analysis

¶ 63     Ross argues that the district court erred by separately listing Comcast, ICS, Bohrenworks, and Underground on the verdict form. Ross contends that these entities "should have been listed together for one allocation of fault" on the verdict form, in accordance with *Ochoa v. Vered*, 212 P.3d 963 (Colo. App. 2009), and the "captain of the ship" doctrine. Otherwise, claimed Ross, multiple parties could be held liable for derivative and duplicative conduct. PSCo argues

---

[6] The parties agreed during trial to leave Ross's estate off the verdict form as a separate plaintiff because Ross conceded that they were not seeking economic damages for the estate. Because any noneconomic damages would go to Ross's heirs regardless, it was unnecessary to include Ross's estate as a separate party on the verdict form and case caption.

that *Ochoa* and the captain of the ship doctrine do not apply here, and that section 13-21-111.5, C.R.S. 2024, required all nonparties to be listed separately on the verdict form.

### 1. Standard of Review

¶ 64     Recall that we review whether the district court's jury instructions correctly state the law de novo, but if the instruction properly informs the jury of the law, we review the form and style of jury instructions for an abuse of discretion. *Johnson*, 255 P.3d at 1067.

### 2. Application

¶ 65     Section 13-21-111.5(1), concerning the pro rata liability of defendants in civil liability cases, provides that

> [i]n an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss . . . .

¶ 66     Section 13-21-111.5(2) provides that "[t]he jury *shall* return a special verdict" regarding each defendant's respective degree or percentage of negligence or fault, that the "entry of judgment shall be made by the court based on the special findings, and [that] no

general verdict shall be returned by the jury." (Emphasis added.) Section 13-21-111.5(3)(b) adds that "[n]egligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty or if the defending party gives notice that a nonparty was wholly or partially at fault." Pro rata apportionment effectuates "the General Assembly's intent that a tortfeasor should pay only for the portion of the injury that he or she caused." *Reid v. Berkowitz*, 2013 COA 110M, ¶ 27.

¶ 67    The district court included the nonparties on the verdict form because of Instruction 26, which allowed the jury to determine if (1) the nonparties were negligent; and (2) the negligence caused Ross's injuries, losses, or damages. Instruction 27 added that, if the jury found the nonparties' negligence caused Ross's damages, then it was also required to "determine to what extent the negligence of each contributed to the damages of the plaintiffs, expressed as a percentage of 100 percent." These instructions and the resulting verdict form reflect the requirements of sections 13-21-111.5(1) and (2).

¶ 68    Ross's reliance on *Ochoa* is misplaced. In *Ochoa,* a division of this court held that "in a medical negligence case involving acts or

34

omissions during surgery, the jury should be instructed that a surgeon is vicariously liable for the negligence of subordinate hospital employees from the time the surgeon assumes control of the operating room until the surgeon concludes the procedure." 212 P.3d at 966. The division reached this conclusion using the "captain of the ship doctrine, which is grounded in respondeat superior, [and] imposes vicarious liability on a surgeon for the negligence of hospital employees under the surgeon's control and supervision during surgery." *Id.*

¶ 69     Ross argues that nonparties Comcast, ICS, Bohrenworks, and Underground were vicariously liable for the single act of striking the pipeline because "there is a direct set of contractual relationships, each including indemnification agreements, running from Comcast to Bohrenworks." But even in cases of vicarious liability, section 13-21-111.5 requires the court to give an apportionment instruction before it apportions and aggregates fault in the judgment. *See Reid*, ¶¶ 38-39 (Section 13–21–111.5 requires that the court "instruct the jury to determine the respective shares of fault of the landowner defendant . . . and the other defendants, but in entering a judgment, the court shall aggregate the fault of the

defendant landowner and any other defendants for whom the landowner defendant is vicariously liable.").

¶ 70    Further, while Ross alleges that separately including all nonparties "caused the jury to overstate their responsibility," this contention is speculative. And regardless, section 13-21-111.5's clear requirements obligated the district court to list each nonparty separately so the jury could apportion the nonparties' fault. *See* § 13-21-111.5(1); *see also Reid*, ¶¶ 38-39. The district court did not err.

## V.    The WDA's Damages Cap

### A.    Additional Background

¶ 71    The district court's earlier ruling — that the felonious killing exception did not apply — led it to apply the WDA damages cap to limit Ross's noneconomic damages to $436,070. In doing so, the court rejected PSCo's argument that the court should *first* apply the damages cap to Ross's award and *then* apportion damages in accordance with the jury's fault allocations. Under this approach, PSCo argued that it should only be held liable for 12% of the total $436,070 WDA cap — $52,328.40. Instead, the district court first apportioned Ross's damages by fault allocation, awarding Ross 12%

of the total $15 million in damages in accordance with PSCo's apportioned fault, and then capped the damages at $436,070.

## B. Analysis

¶ 72 On cross-appeal, PSCo argues that the district court improperly applied the WDA's damages cap when it first apportioned liability. PSCo contends that this order violates the supreme court's holding in *Lanahan v. Chi Psi Fraternity*, 175 P.3d 97 (Colo. 2008), which it argues held that the WDA's damages cap is "to be a per-case limitation, not a per-defendant limitation." Ross contends that some of the theories PSCo references were not preserved, but we conclude that PSCo sufficiently preserved these arguments for appeal. *See Gebert*, ¶ 25. Ross also argues, however, that *Lanahan* is inapposite and that *Alhilo v. Kliem*, 2016 COA 142, on which the district court relied, applies.

### 1. *Lanahan* and *Alhilo*

¶ 73 In *Lanahan*, a WDA case with nine defendants, the Colorado Supreme Court held that "under the plain language of section 13–21–203, the noneconomic damages cap in wrongful death actions applies on a per claim basis." *Lanahan*, 175 P.3d at 100. Interpreting the word "recovery" in section 13-21-203(1)(a), the

supreme court concluded that "recovery" "refers to what the plaintiff is entitled to — period, not on a per defendant basis." *Lanahan*, 175 P.3d at 101; *see also* § 13-21-203(1)(a) ("[T]here shall be no *recovery* . . . for noneconomic loss or injury in excess of two hundred fifty thousand dollars . . . .") (emphasis added). The supreme court therefore held that "the plain language of section 13-21-203 limits to $250,000 the noneconomic damages that can flow from a wrongful death, unless the conduct causing the death constituted a felonious killing," and the "aggregate recovery for noneconomic damages is limited to . . . the amount of the cap adjusted for inflation — from all liable Respondents jointly." *Lanahan*, 175 P.3d at 103.

¶ 74    In *Alhilo*, however, a division of this court looked to the issue of comparative negligence between a WDA plaintiff and a single defendant, noting that "comparative negligence reduces the amount of damages found by the trier of fact, to determine the amount recoverable by a plaintiff." *Alhilo*, ¶ 70. The division held that "[o]nce the amount of a plaintiff's recovery is determined, then the noneconomic damages cap in section 13-21-203 comes into play,"

38

and therefore, the WDA's damages cap is applied after a plaintiff's damages are reduced for comparative negligence. *Alhilo*, ¶¶ 71-74.

¶ 75     *Alhilo* does not conflict with *Lanahan*'s holding — that the WDA's damages cap limits a plaintiff's recovery on a per claim basis — because a plaintiff's comparative negligence reduces a plaintiff's total recoverable damages as determined by the trier of fact before the cap is applied. *Lanahan*, 175 P.3d at 101-03; *Alhilo*, ¶¶ 71-72.

## 2.     Application

¶ 76     *Alhilo* is distinguishable from this case for two reasons. First, like in *Lanahan*, this case involved multiple parties among which the jury apportioned a percentage of fault. Second, in this case there was no suggestion that Ross bore any comparative negligence that might reduce damages. As a result, the holding in *Lanahan*, and not the holding in *Alhilo*, controls the outcome.

¶ 77     If a WDA claim involves multiple defendants and a plaintiff who bore some degree of comparative negligence (and the felonious killing exception did not apply), the district court would (1) reduce the plaintiff's total recovery in accordance with their comparative negligence; (2) apply the cap; and then (3) apportion the total

39

recovery of capped damages in accordance with the defendants' proportional fault. *See Alhilo,* ¶¶ 71-74; *Lanahan,* 175 P.3d at 101-03. If the felonious killing exception applies, the district court must instead (1) reduce the plaintiff's total recovery in accordance with her comparative negligence (if any) and then (2) apportion the total recovery of uncapped damages in accordance with each defendant's proportional fault.

¶ 78 Thus, we conclude that the district court erred by first apportioning PSCo's damages to its 12% of fault before applying the cap. *See Lanahan,* 175 P.3d at 101-03. On remand, *if* the district court finds that the felonious killing exception applies, then it must award Ross 12% of the $15 million noneconomic damages award ($1.8 million). But if it finds that the felonious killing exception does not apply, it must award Ross 12% of the total capped recovery award ($52,328.40).

## VI. Disposition

¶ 79 We affirm the district court's judgment in part, reverse it in part, and remand the case for the court to determine if the felonious killing exception applies and to recalculate Ross's noneconomic damages with any appropriate interest.

40

JUDGE LUM and JUDGE HAWTHORNE concur.